**1337523 ONTARIO, INC., Plaintiff,**

v.

**GOLDEN STATE BANCORP, INC, et al., Defendants.**

**No. C–00–3661 EDL.**

United States District Court, N.D. California.

Sept. 17, 2001.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAPORTE, United States Magistrate Judge.

### INTRODUCTION

On August 18, 2000, Plaintiff 1337523 Ontario, Inc. ("Plaintiff") and Defendants Golden State Bancorp, Inc., GSB Aviation (Two), LLC and Insured Aircraft Service (collectively "Defendants") entered into a written contract for the sale of Plaintiff's 1982 Grumman Gulfstream III aircraft to Defendants for $11.5 million. On October 3, 2000, Plaintiff filed its Complaint for Declaratory Relief and Damages for Breach of Contract, seeking a judicial determination of the parties' rights with respect to the contract, including Defendants' $250,000 deposit.

On July 10, 2001, Defendants moved for summary judgment, seeking return of their deposit pursuant to paragraphs 4, 6 and 7 of the contract. On July 24, 2001, Plaintiff timely opposed this motion and on July 31, 2001, Defendants timely replied.

On August 28, 2001, the Court held a hearing on Defendants' Motion for Summary Judgment. Both parties appeared through their counsel of record. Upon consideration of the parties' submissions, the arguments at the hearing, the relevant authorities and the record in this case and good cause appearing, the Court enters the following Order.

### FACTS

Defendants desired to purchase a corporate jet and retained Robert Hart ("Hart") of Welsch Aviation for that purpose. *See* Declaration of Charles Kay ("Kay Decl.") at ¶ 2; Declaration of Robert Hart ("Hart Decl.") at ¶ 2. Hart located a Gulfstream III aircraft for sale in Ontario, Canada. *See* Kay Decl. at ¶ 2; Hart Decl. at ¶ 2. Al

Stephen R. Ginger, Harry A. Safarian, Condon & Forsyth, LLP, Los Angeles, CA.

Barry D. Hovis, Musick, Peeler & Garrett, San Francisco, CA.

Frey ("Frey"), an aircraft technician for Defendant GSB Aviation (Two) LLC, acted as coordinator for GSB Aviation (Two) for the purchase of the aircraft. *See* Declaration of Al Frey ("Frey Decl.") at ¶ 1. The aircraft needed pre–purchase/72–month inspections. *See* Kay Decl. at ¶ 3.

Because it seemed as if the inspections would be completed by the desired closing date of September 30, 2000, Defendants authorized Hart to submit an Offer for Purchase for the Gulfstream, which he did on July 28, 2000. *See* Kay Decl. at ¶ 3; *see also* Hart Decl. Ex. A. When Plaintiff agreed to the sale, a formal purchase and sale agreement was drafted. *See* Declaration of Christianne Chen ("Chen Decl.") at ¶¶ 4, 6 & Ex. C.

### 1. The Relevant Portions of the August 18, 2000 Agreement

Plaintiff and Defendants signed the final purchase agreement on August 18, 2000 ("August 18, 2000 Agreement" or "Agreement"). *See* Chen Decl. Ex. C. The August 18, 2000 Agreement stated that inspection of the aircraft, including the 72 month inspection and pre-purchase inspection, would commence no later than August 20, 2000. Chen Decl. Ex. C at ¶ 6. The inspections were to be carried out by Gulfstream Aerospace Corporation with Frey as the liaison.

Paragraph 3, entitled *"Delivery,"* states that "[t]he aircraft shall be delivered to Purchaser, who shall accept delivery of the Aircraft at Dallas/Fort Worth, Texas or such other place in the United States of America as designated by Purchaser, subject to the terms and conditions contained in this agreement." Chen Decl. Ex. C at ¶ 3. The August 18, 2000 Agreement does not provide a specific date for delivery of the aircraft to Defendants.

Paragraph 4 contains the seller's representations and warranties. In particular, paragraph 4(e) states, "[a]ll airworthiness

directives, mandatory aircraft service changes and maintenance under the manufacturer's recommended maintenance program, in accordance with FAR 91.409(f)(3) shall be complete and up-to-date at the date of delivery." Chen Decl. Ex. C at ¶ 4(e). In addition, paragraph 4(f) states, "[t]he Aircraft shall be delivered to the Purchaser in the same condition as viewed by the Purchaser on July 27, 2000, save and except for normal wear and tear. The Aircraft shall be delivered to Purchaser with all systems functioning normally." *Id.* at ¶ 4(f). Paragraph 4 concludes that if any of the covenants or warranties set forth in that paragraph are unfulfilled at the date of delivery of the Aircraft, Defendants may unilaterally rescind the agreement and receive a full refund of their $250,000 deposit. *See id.* at ¶ 4.

Paragraph 6 sets forth the three conditions under which the $250,000 deposit becomes non-refundable. Specifically, paragraph 6 states:

> The deposit ... shall become non-refundable if and only if all of the following conditions are satisfied: (i) within 10 days of Vendor's receipt of a list of all of the deficiencies of either an airworthiness, safety or flight operational nature, if any, identified by the 72 month and pre-purchase inspections, Vendor in writing authorizes and directs [Gulfstream Aerospace Corporation] to rectify all of the deficiencies and confirms Vendor's agreement to pay for all cost associated with rectifying the deficiencies; (ii) the total estimated costs (as agreed to in writing by GAC) of rectifying the deficiencies does not exceed the amount of U.S. $500,000; and (iii) the aggregate time period required to rectify the deficiencies does not exceed 3 months (as estimated by GAC). In the event any one of the conditions in the preceding sentence is not satisfied, Purchaser may, in its sole discretion, elect

to terminate the Agreement and the Deposit shall be immediately returned to the Purchaser. If either the total actual cost of rectifying the deficiencies exceeded the cap set forth above or GAC is unable to rectify all of the deficiencies in the prescribed time period, then Purchaser may, in its sole discretion, elect to terminate the Agreement and the Deposit shall be immediately returned to Purchaser.

Chen Decl. Ex. C at ¶ 6. If any of the conditions are not satisfied, then Defendants can terminate the Agreement and receive a refund of their deposit. *See id.*

The closing date for the transaction is set forth in paragraph 7. *See* Chen Decl. Ex. C at ¶ 7. Specifically, paragraph 7 states,

> ... the transaction will close and the Vendor will deliver the Aircraft to the Purchaser, and the Purchaser will accept delivery of the Aircraft at a mutually agreeable location as soon as practicable following the later of Purchaser's acceptance of the pre-purchase/72 month inspection or the completion of all work by GAC to rectify any and all deficiencies, but in no case shall the closing date be later than September 30, 2000 (the "Closing Date") or such further date as shall be agreed to by the parties in writing.

*Id.*

### 2. The Alleged Breach of the August 20, 2000 Agreement

In accordance with paragraph 6, the aircraft arrived in Dallas for inspections on August 20, 2000. Inspections were to begin on August 21, 2000 under the supervision of Frey. *See* Frey Decl. at ¶¶ 4–5. The projected completion date for the inspections was approximately September 25, 2000. *See id.* at ¶ 4, Ex. K.

When the aircraft arrived on August 20, 2000, however, it was not airworthy. Because the first part of the required inspections involved a flight test, the planned inspections could not take place until repairs were made to make the aircraft airworthy. *See* Frey Decl. at ¶ 6. Frey authorized Gulfstream to make the necessary repairs to ready the aircraft for the pre-purchase inspections. *See id.* at ¶ 7. These airworthiness repairs took one week and so the flight test did not occur until August 28, 2000. *See id.* Accordingly, the inspection schedule fell behind one week. *See id.* To ensure that the inspections would be completed for the September 30, 2000 closing date, Frey authorized overtime. *See id.* Soon thereafter, however, when Frey determined that the inspections would not be completed until after the projected September 30, 2000 closing date, Frey instructed Gulfstream to cease further work on the aircraft as of August 29, 2000. *See id.* at ¶ 9.

Plaintiff objected to Defendants' decision to cease work on the aircraft in several letters. *See* Chen Decl. Exs. G, H. Defendants sent a letter to Plaintiff dated September 6, 2000, advising that they were canceling the August 20, 2000 Agreement. *See id.* Ex. I. Defendants demanded return of their deposit in a letter dated September 8, 2000. *See* Hart Decl. Ex. J.

### LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact

is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* The court may not weigh the evidence. *See id.* at 255, 106 S.Ct. 2505. Rather, the non-moving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." *United Steelworkers of America v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. However, the opposing party need not produce evidence in a form that would be admissible at trial in order to avoid a summary judgment. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nor must the opposing party show that the issue will be resolved conclusively in its favor. *See Liberty Lobby,* 477 U.S. at 248–49, 106 S.Ct. 2505. All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring a jury or judge to resolve the parties' differing versions of the truth at trial. *See id.*

**DISCUSSION**

The material facts of this case are not in dispute. The issue is one of the interpretation of the August 18, 2000 Agreement. In their Motion for Summary Judgment, Defendants contend that they are entitled to the return of their $250,000 deposit pursuant to paragraph 4 and pursuant to paragraphs 6 and 7 of the August 18, 2000 Agreement.

**1. Defendants are Entitled to Summary Judgment Based on Paragraph 4**

■■ By its express terms, the August 18, 2000 Agreement is governed by and interpreted in accordance with Canadian law. *See* Chen Decl. Ex. C at ¶ 8. Under Canadian law, unambiguous words in a contract should be given their literal meaning unless to do so would result in an absurdity. *See Gadbois v. Bonte Foods, Ltd.,* [1988] 94 N.B.R. (2d) 21 at ¶ 34; *see also* G.H.L. Fridman, *The Law of Contract in Canada* 492 (4th ed.1999) (parties are presumed to have intended the ordinary meaning of the words used.). Where the language is clear, no extrinsic parol evidence may be admitted to alter, vary or interpret the words used. *See Hawrish v. Bank of Canada,* [1969] S.C.R. 515; *Transcanada Pipelines Ltd v. Northern & Central Gas Corp.,* [1983] 146 D.L.R. (3d) 293 296.

■ Where there is an ambiguity in the contract terms, however, extrinsic evidence may be admitted to explain, but not to vary or contradict, the written instrument. *See AGP, Inc. v. Chinook Grain Co.,* 1999 CarswellAlta 1068 at ¶ 66 (parole evidence is admissible "to dispel ambiguities, to establish a term implied by custom, or to demonstrate the factual matrix of the agreement."); *Transcanada,* 146 D.L.R.

(3d) at 296–97 (extrinsic evidence "is not admissible to add to, vary or subtract from or contradict the terms of the written instrument."); *Gadbois,* 94 N.B.R. (2d) 21 at ¶ 34 (parol evidence is inadmissible if it would contradict the terms of the contract); *see also* Fridman, *supra,* at 482. Further,

> [w]here a doubt arises as to the true sense and meaning of the words themselves or there is any difficulty as to their application in the circumstances, then the sense and meaning of the words used in the written documents may be investigated and determined by viva voce and documentary evidence outside of the instrument in dispute.

*Transcanada,* 146 D.L.R. (3d) at 296.

The main issue with respect to paragraph 4 is whether "delivery" means August 20, 2000, when the plane arrived in Dallas for pre-purchase inspections as Defendants contend, or whether it means at or after closing as Plaintiff argues. Although the date of delivery is at times distinguished from the date of closing in the Agreement, the Agreement does not specify the date of delivery.

Defendants acknowledge that the delivery date is not defined in the contract and, indeed, that in some contexts delivery refers to August 20, 2000 and in others to closing or post-closing. *See* Defs.'s Reply at 6:3–5. Defendants contend that in the paragraphs 4(e) and (f) "delivery" refers to August 20, 2000, and any other date would eliminate the need for some of the covenants in paragraph 4. *See* Defs.'s Reply at 5:19–6:2.

Plaintiff responds that Defendants' interpretation of the term "delivery" is "wholly unsupported by the express language of the Agreement." Pl.'s Opp'n at 3:24–25. For this argument, Plaintiff relies on language in paragraph 7 stating that delivery of the aircraft will take place following the later of Defendants' accep-

tance of the inspections or the completion of all the work by Gulfstream. *See* Chen Decl. Ex. C. at ¶ 7. Under paragraph 7, therefore, Plaintiff argues that "delivery" was to take place either at closing or post-closing. Plaintiff also notes that paragraph 6 gives Plaintiff three months to fix any deficiencies identified by the inspections. *See id.* at ¶ 6. Under that paragraph, Plaintiff contends that since the contract provided for a three-month period for repairs, delivery could take place post-closing. Plaintiff also states that paragraph 4(g) "clearly and unmistakably" embodies the parties' intent that delivery was to occur after completion of the inspections. That paragraph states:

> The Vendor warrants that the aircraft was not and will not be flown, between August 10, 2000 and the date of delivery, without the expressed written consent from the Purchaser, which consent shall not be unreasonably withheld, save and except for the European trip and for flights necessary for the pre-purchase inspection as detailed herein.

Chen Decl. Ex. C at ¶ 4(g). Under that paragraph, Plaintiff argues that the August 18, 2000 Agreement contemplated that there would be inspection flights before the date of delivery so the date of delivery could not be August 20, 2000 because inspections had not yet started.

■ "Delivery," as used in paragraph 4, is ambiguous. First, the August 18, 2000 Agreement does not specifically define "delivery" as occurring on a certain date. Indeed, the term "delivery" seems to be used inconsistently throughout the Agreement. *Compare* Chen Decl. Ex. C at ¶ 6 ("The Vendor agrees to deliver the Aircraft to the Purchaser in the condition more particularly described in Schedule "A" attached hereto. The Aircraft shall be subject to a 72 month/pre-purchase inspection, including a flight check, which inspec-

tion shall commence no later than August 20, 2000, at Gulfstream Aerospace Corporation ("GAC") in Dallas, Texas) *with* Chen Decl. Ex. C at ¶ 7 ("Subject to the terms, conditions, representations and warranties set out herein, the transaction will close and the Vendor will deliver the Aircraft to the Purchaser, and the Purchaser will accept delivery of the Aircraft at a mutually agreeable location...."). Second, to interpret the delivery date as at or after closing would render portions of paragraph 4 surplusage. For instance, if delivery referred to a time at or after closing, then the warranty in paragraph 4(e) would be meaningless because the maintenance necessarily would have been completed after the 72–month and pre-purchase inspections which were required prior to closing. Similarly, the warranty in paragraph 4(f) would be meaningless if the date of delivery was at or after closing because at that time, all inspections would necessarily be completed pursuant to paragraph 7 of the August 18, 2000 Agreement and all systems would be functioning normally. Because the term "delivery" is ambiguous, the Court will consider extrinsic evidence to explain that written term as permitted under Canadian law.

██ Defendants have submitted declarations and evidence to support their contention that "delivery" as used in paragraph 4 refers to August 20, 2000. Most importantly, the written Offer to Purchase dated July 28, 2000 and submitted by Defendants to Plaintiff stated that "[t]he aircraft will be delivered by the Seller to Gulfstream Aerospace Corporation, Dallas TX to facilitate a 72 month inspection on or about August 20, 2000." Hart Decl.

¶¶ 3–6; Ex. A at ¶ 6;[1] Supplemental Declaration of Robert Hart ("Supp. Hart Decl.") at ¶¶ 2, 3. In addition, paragraph 12 of the Offer to Purchase states that the closing date will be no later than September 30, 2000, but does not use the term "delivery" at all. *See* Hart Decl. Ex. A at ¶ 12. The bulk of the Offer to Purchase was adopted in the August 18, 2000 Agreement as paragraph 4.

Further, the senior vice president of Defendant Golden State Bancorp, Charles Kay, contemplated that the aircraft would be "delivered to Gulfstream by not later than August 20, 2000." Kay Decl. at ¶ 4. Defendants' aircraft technician stated that the aircraft was not airworthy when it was delivered to Gulfstream in August 2000. *See* Frey Decl. at ¶ 6.

Kay stated that Defendant needed the purchase to close no later than September 30, 2000. *See* Kay Decl. at ¶ 3 ("the timing of when we would have access to the aircraft to do the necessary inspections and the timing of Gulfstream's ability to perform those inspections were important elements of our willingness to purchase the aircraft."). Further, Hart conveyed to George Rependa, the broker representing Plaintiff in the sale of the aircraft, that "Golden State Bancorp had certain time requirements with regard to the purchase" and that "timing was important to Golden State Bancorp." Hart Decl. at ¶ 3. For those reasons, Hart told Rependa that "delivery to Gulfstream needed to be as soon as possible." *Id.* In preparing the Offer to Purchase, Hart considered the timing needs of Defendants and provided that delivery was to take place no later than August 20, 2000 and that the closing date

---

**1.** The Offer to Purchase was also attached as an exhibit to Plaintiff's complaint in this case. *See* Compl. Ex. A. Although Plaintiff does not rely on the Offer to Purchase in its opposition to Defendants' Motion for Summary Judgment, Plaintiff's inclusion of the document as an exhibit to the complaint reinforces the Court's conclusion that the Offer to Purchase is important to the interpretation of the August 18, 2000 Agreement and should be considered by the Court.

would be no later than September 30, 2000. *Id.* at ¶ 4; Hart Decl. Ex. A at ¶¶ 6, 12.

Plaintiff opposes consideration of Defendants' extrinsic evidence on the ground that the August 18, 2000 Agreement is clear and unambiguous. The Court, as explained above, disagrees. Plaintiff did not submit any extrinsic evidence to support its view that "delivery" was to take place at or after closing of the sale. Based on the ambiguity of the contract and the extrinsic evidence provided by Defendants, especially the July 28, 2000 Offer to Purchase, the Court concludes that the date of "delivery" as used in paragraph 4 was August 20, 2000.

[7] Defendants contend that there is no triable issue of fact that Plaintiff failed to fulfill paragraphs 4(e) and (f) at the time of delivery on August 20, 2000. With respect to paragraph 4(e), the evidence is uncontradicted that the plane was not in compliance with the manufacturer's maintenance directives or with the Federal Air Regulations, primarily because the 72–month inspection had not been completed by the date of delivery on August 20, 2001. *See* Chen Decl. Ex. E; Frey Decl. at ¶ 5. Plaintiff, however, had received an extension until September 30, 2000 to complete the inspection. *See* Chen Decl. Exs. E, F. Therefore, there is a triable issue of fact as to whether Plaintiff failed to fulfill this covenant and warranty contained in the August 18, 2000 Agreement.

█ The evidence is undisputed, however, that Plaintiff failed to fulfill the covenant and warranty in paragraph 4(f) by the date of delivery, August 20, 2000. Specifically, Plaintiff failed to deliver the aircraft on August 20, 2000 with all systems functioning normally. *See* Frey Decl. at ¶ 6 (left engine failed to achieve takeoff power and anti-skid system was malfunctioning). Therefore, Defendants are entitled to the return of their $250,000 deposit under paragraph 4.

Accordingly, Defendants' Motion for Summary Judgment is GRANTED. Because Defendants are entitled to summary judgment based on paragraph 4, the Court need not address Defendants' other grounds for summary judgment based on paragraphs 6 and 7 of the August 18, 2000 Agreement.

### 2. Objections to Evidence

Plaintiff filed objections to all of the evidence submitted by Defendants, except the August 18, 2000 Agreement, which is exhibit C of the Chen declaration. As an initial matter, Plaintiff's objections to all declarations and supplemental declarations on the grounds that they are not based on personal knowledge and not made under penalty of perjury are overruled.

█ Plaintiff also objected to all exhibits except exhibit C as inadmissible hearsay. Plaintiff's objections to those exhibits, except for exhibit D, are overruled. Plaintiff's objection to exhibit D, however, is sustained.[2] Exhibit D is a letter from Mark Karls, the Hangar Manager at Gulfstream Aircraft Inc., to Frey telling Frey that the total time required for inspections for the aircraft is approximately 28 days, which put the inspection completion date sometime after the closing date of September 30, 2000. *See* Chen Decl. Ex. D. This exhibit is hearsay. Defendants, however,

---

**2.** For the same reasons that Plaintiff's objection to exhibit D is sustained, Plaintiff's objections to the Chen declaration at paragraph 8, the Hart declaration at paragraph 7, the Frey declaration at paragraphs 8 and 9, the Kay declaration at paragraph 6 and the Hovis declaration at paragraph 2 as inadmissible hearsay are sustained to the extent that the declarations reference statements made by Gulfstream to Defendants or their employees regarding the fact that the inspections could not be completed until mid-October.

contend that exhibit D falls within several exceptions to the hearsay rule, namely, those exceptions in Federal Rules of Evidence 803(1), 803(3), 804(b)(3) and 807. As described below in more detail, exhibit D does not fall within any hearsay exception and therefore is not admissible.

■ Rule 803(1) permits admission of statements that are otherwise hearsay if the statements reveal the present sense impression of the declarant. *See* Fed. R.Evid. 803(1). One of the key components of this exception is that the statement be made nearly contemporaneously with the happening of the event or condition. *See Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir.1995). Exhibit D does not constitute the present sense impression of Karls because he wrote this letter several days after Gulfstream advised Frey that the inspections could not be completed by September 30, 2000.

■ Rule 803(3) permits admission of statements that are otherwise hearsay if the statements reveal the then existing mental, emotional or physical condition of the declarant. *See* Fed.R.Evid. 803(3). As with present sense impression, one of the key components of this exception is contemporaneousness. *See United States v. Miller*, 874 F.2d 1255, 1264 (9th Cir.1989). As with the present sense impression exception, exhibit D does not constitute a statement regarding Karls' existing mental, emotional or physical condition.

■ Rule 804(b)(3) permits admission of statements that would otherwise be hearsay if the statements reveal a statement against the declarant's interest. *See* Fed.R.Evid. 804(b)(3). This exception only applies if the declarant is unavailable. *Id.* A declarant is unavailable where he is exempt from testifying based on privilege, refuses to testify, lacks memory, is dead or otherwise physically unable to attend or is absent from the hearing and the proponent of the statement is unable to procure his attendance by process or other reasonable means. *See* Fed.R.Evid. 804(a). Defendants rely on the last category of unavailability, that is, that Defendants are unable to procure Karls' attendance because he is in Texas. This fifth category, however, requires that an attempt be made to depose a witness as well as to seek his attendance as a precondition to the witness being deemed unavailable. *See* Fed. R.Evid. 804 advisory committee's note (1974 enactment); *United States v. Olafson*, 203 F.3d 560, 565 (9th Cir.2000) (a witness is not considered unavailable unless a good faith effort is made to obtain the witness's presence).

Defendants stated at the August 28, 2001 hearing that they tried to produce Karls' declaration, but that counsel for Gulfstream would not permit Karls to sign it. Defendants conceded that they did not make any more attempts to secure Karls' testimony through deposition. Defendants did not make a good faith effort to obtain Karls' testimony. Therefore, Karls was not unavailable for purposes of Rule 804(b)(3) and exhibit D does not fall within that hearsay exception.

Lastly, Rule 807 addresses situations that are not specifically covered by Rules 803 and 804 and permits admission of statements that would otherwise be hearsay if those statements have "equivalent circumstantial guarantees of trustworthiness." Fed.R.Evid. 807. To determine whether a statement should be admitted under this exception, a court must examine whether the statement is offered as evidence of a material fact, whether the statement is more probative than any other evidence on the point for which it is offered and whether the general purposes of the rules and the interests of justice will be best served by admission of the statement. Fed.R.Evid. 807. This residual exception should be used rarely and only in

exceptional circumstances. Fed.R.Evid. 803 advisory committee's notes (1974 enactment) (Rule 807 was formally Rule 803(24)); *United States v. Valdez–Soto*, 31 F.3d 1467, 1477 (9th Cir.1994). Exhibit D does not meet the requirements of Rule 807, primarily because the general purposes of the rules and the interests of justice would not be best served by the admission of this evidence, particularly where Defendants made no attempt to secure Karls' testimony.

Plaintiff makes several objections to particular paragraphs of Defendants' declarations as inadmissible parol evidence based on its theory that the August 18, 2000 Agreement is clear on its fact and that no extrinsic evidence is admissible. *See* Chen Decl. at ¶¶ 2–4, 6–7; Hart Decl. at ¶¶ 2–6, Frey Decl. at ¶¶ 3–4; Kay Decl. at ¶¶ 2–7; Supp. Hart Decl. at ¶¶ 2–5. These objections are overruled in light of the Court's decision to permit extrinsic evidence to determine the date of delivery for purposes of paragraph 4.

Plaintiff makes several objections to particular paragraphs of Defendants' declarations based on irrelevance. *See* Chen Decl. at ¶¶ 2–3, 6–9; Hart Decl. at ¶¶ 2–7; Frey Decl. at ¶¶ 2–10; Kay Decl. at ¶¶ 2–8; Declaration of Barry Hovis ("Hovis Decl.") at ¶¶ 2–5. The objections, except with respect to the Hovis declaration, are overruled in light of the Court's decision to permit extrinsic evidence to determine the date of delivery. Plaintiff's objection to the Hovis declaration is overruled because his declaration recounts his attempts to obtain Karls' testimony which is relevant to the admissibility of exhibit D.

Plaintiff makes additional objections based on hearsay. *See* Chen Decl. at ¶ 9; Hart Decl. at ¶¶ 1–6; Frey Decl. at ¶¶ 3–4; Kay Decl. at ¶¶ 2–5; Hovis Decl. at ¶¶ 3–5. Sentence one of paragraph 9 of the Chen declaration is hearsay without an exception, but the remainder of the paragraph is not hearsay or falls within a hearsay exception. To the extent that paragraph 9 of the Chen declaration is hearsay, Plaintiff's objection is sustained.

Paragraphs 1 through 6 of the Hart declaration are not hearsay. Plaintiff's objections to those paragraphs are overruled.

Sentences one and four of paragraph 3 of the Frey declaration are hearsay without an exception, but the remainder of the paragraph is not hearsay or falls within a hearsay exception. Sentences three and four of paragraph 4 are hearsay without an exception, but the remainder of the paragraph is not hearsay. To the extent that the Frey declaration contains hearsay, Plaintiff's objection is sustained.

Paragraphs 2 and 3 of the Kay declaration are not hearsay. Sentences one and two of paragraph 4 are hearsay without an exception, but the remainder of the paragraph is not hearsay or is hearsay within an exception. Sentence one of paragraph 5 is hearsay without an exception, but the remainder of that paragraph is not hearsay. To the extent that the Kay declaration contains hearsay, Plaintiff's objections are sustained.

Paragraphs 3 and 5 of the Hovis declaration do not contain hearsay. Paragraph 4 is not hearsay because it is not offered for the truth of Karls' statements but for the fact that they were made. Plaintiff's objections to these paragraphs are overruled.

Plaintiff also objects to the supplemental Hart declaration as containing evidence that is barred by the doctrine of judicial estoppel. Judicial estoppel " 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " *New Hampshire v. Maine*, 532 U.S. 742, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968 (2001)

(quoting *Pegram v. Herdrich,* 530 U.S. 211, 227, n. 8, 120 S.Ct. 2143, 147 L.Ed.2d 164 (2000)). The supplemental Hart declaration does not contain an argument contradictory to any prior positions taken by Defendants. The declaration simply reiterates Defendants' position that the date of delivery was August 20, 2000. Therefore, Plaintiff's objection based on judicial estoppel is overruled.

## CONCLUSION

Defendants' Motion for Summary Judgment (docket number 32) is GRANTED. Defendants are entitled to the return of their $250,000 deposit. The clerk shall close the file.

IT IS SO ORDERED.